| | | |
|---|---|---|
| DUGDALE, INC., | ) | |
|     *Plaintiff/Counter-Defendant*, | ) | |
| | ) | |
|     *vs.* | ) | |
| | ) | |
| ALCATEL-LUCENT USA, INC., *et al.*, | ) | 1:09-cv-0960-JMS-TAB |
|     *Defendants/Counter-Plaintiffs/Third-* | ) | |
|     *Party Plaintiffs*, | ) | |
| | ) | |
|     *vs.* | ) | |
| | ) | |
| G3 PARTNERS, INC., | ) | |
|     *Third-Party Defendant*. | ) | |

## ORDER ON G3 PARTNERS, INC.'S MOTION FOR SUMMARY JUDGMENT

Presently before the Court is Third-Party Defendant G3 Partners, Inc.'s ("G3") Motion for Summary Judgment on Defendants/Counter-Plaintiffs/Third-Party Plaintiffs Alcatel-Lucent USA, Inc., Alcatel USA Marketing, Inc., and Alcatel Interworking, Inc.'s (collectively, "Alcatel") claims against G3 for breach of contract, open book account, and account stated. [Dkt. 75.]

## I.
### SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor. *See* Fed. R. Civ. Pro. 56. When evaluating a motion for summary judgment, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial . . . against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). Nevertheless, "the Court's favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Singer v. Raemisch*, 593 F.3d 529,

533 (7th Cir. 2010). The non-moving party must set forth specific facts showing that there is a material issue for trial. Fed. R. Civ. Pro. 56(e); *Celotex*, 477 U.S. at 323. The key inquiry is the existence of evidence to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999).

## II.
### BACKGROUND

This litigation stems from a telecommunications deal gone bad. Alcatel sued Dugdale for $553,793.09 for failing to pay past due purchase orders. *Alcatel-Lucent USA, Inc. v. Dugdale Commc'n Inc., et al.*, Cause No. 1:10-cv-278-LJM-TAB [dkt. 89].[1] Alcatel contends that G3 is liable for Dugdale's debt because G3 is allegedly Dugdale's successor. [*Id.*]

Through the present motion, G3 seeks a declaration that it does not share in any liability that Dugdale may have to Alcatel. The parties' dispute surrounds the Asset Purchase Agreement ("Purchase Agreement") or (the "Transaction") that G3 and Dugdale entered into in May 2009. G3 contends that Dugdale remained an independent entity following the Transaction, while Alcatel contends that the Transaction was a *de facto* merger, such that G3 is liable for any of Dugdale's liabilities stemming from this lawsuit. The facts that follow are undisputed, unless otherwise noted.

Dugdale and G3 entered into the Purchase Agreement on May 13, 2009. [Dkt. 77-1.] Pursuant to the Purchase Agreement, G3 purchased certain assets from Dugdale, including equipment; inventory; intellectual property; customer and prospect lists; customer contracts; assumed contracts; work in process; websites, urls, and domain names; and non-corporate books

---

[1] Although Alcatel initially filed an independent lawsuit against Dugdale and G3, that action was later consolidated with Dugdale's lawsuit against Alcatel.

and records, files, papers, promotional materials, catalogues. [Dkt. 77-1 at 2-3 ¶ 2.1.] G3 paid Dugdale approximately $3,600,000 in cash for the assets it purchased. [Dkts. 77-1 at 5 ¶ 2.6; 77-4 at 3 ¶ 4.] No stock was exchanged in the Transaction. [Dkts. 77-4 at 3 ¶ 4; 101 at 13 ¶ 5.] The Purchase Agreement contains a non-compete provision that restricts Dugdale from competing with G3 for three years and from attempting to solicit any G3 customer or former Dugdale customer for five years. [Dkt. 77-1 at 13 ¶ 5.4.]

G3 assumed a small portion of Dugdale's liabilities in the Purchase Agreement. [Dkt. 77-1 at 4 ¶ 2.4.] Alcatel does not argue that the liabilities expressly assumed in the Purchase Agreement include liabilities stemming from Alcatel's claims against Dugdale in this lawsuit.

G3 hired thirteen of Dugdale's twenty-eight employees (46%). [Dkts. 77-5 at 4 ¶ 9; 102-14 at 3.] One of those employees, Angela Witham, assumed a managerial position at G3, while the other twelve assumed non-managerial positions. [*Id.*] Ms. Witham represented to G3 that she had been running "all aspects" of Dugdale since 2002. [Dkt. 102-16 at 2.] The thirteen employees G3 hired worked for G3 from Dugdale's location for sixty days following the Transaction. [Dkts. 102-1 at 19; 77-4 at 3 ¶ 6.] Dugdale continued to employ five employees for "the greater part of 2009." [Dkt. 77-4 at 4 ¶ 9.]

On May 14, 2009, Dugdale sent its clients and strategic business partners an announcement informing them that

> Dugdale Communications and G3 Technology Partners have agreed to merge our operations (see attached Press Release). In a practical sense, this is the epitome of a merger. We are joining forces. We are adding our installed base customers together. We are adding our operations staff together. We are adding our revenue and margin together.

[Dkt. 102-6 at 3.] G3 and Dugdale attached a list of "Frequently Asked Questions" to the announcement. [Dkt. 102-8 at 2.] Among other things, the information provided that "the merging

of Dugdale Communications and G3 Technology Partners is the joining together of two organizations that have many things in common. We strongly believe that by joining forces, the combined company will have additional market presence and stronger support capabilities." [Dkt. 102-8 at 2.] Dugdale assured its clients that "we are planning for it to remain 'business as usual' for at least the next 6-8 months, if not longer." [*Id.*] Recipients were also informed that "[w]here there is duplication in non-customer facing, back office functions there will be consolidation and integration soon after the merger is complete, as is customary when companies merge." [*Id.*]

G3 and Dugdale also published a list of internal "Frequently Asked Questions" directing staff how to respond to client questions about the "merger." [Dkt. 102-11 at 2.] The information provided that G3 "is acquiring the assets of Dugdale Communications and will be integrating the two organizations over time." [*Id.*] Specifically, the companies would be run "independently" for six to eight months and then "move toward integration." [*Id.*] "Within months Dugdale Communications will assume the brand Dugdale Communications, a G3 Partners Company[ . . . and o]ver time the merged company will operate under G3 Technology Partners." [*Id.* at 3.]

Dugdale assumed the name "Dugdale Communications, a G3 Partners Company" after the Transaction. [Dkts. 102-15 at 8 (invoices to former clients), 11 (signature block on services contract); 102-20 at 2 (email signature block).] G3 was permitted to use Dugdale's email addresses and website for up to two years. [Dkt. 102-1 at 19.]

Pursuant to a consulting agreement, Dugdale provided consulting services to G3 for eight months following the Transaction. [Dkt. 77-1 at 15 ¶ 5.10.] Those services included assisting closing transactions, renewing and closing maintenance agreements, and generally transitioning customers. [*Id.*] G3 paid Dugdale $10,000 for each month of services. [*Id.*] Dugdale could also

receive a share of revenue from specified potential deals involving former clients. [Dkt. 102-4 at 5 ¶ 2.] Dugdale earned approximately $625,000 from an escrow account set up for that purpose. [Dkt. 102-12 at 9.]

The parties dispute whether Dugdale continued to exist as more than a shell corporation to assist G3 with the transition. Alcatel argues that because of a non-compete provision in the Purchase Agreement, Dugdale "could not continue conducting <u>any</u> of its primary business activities despite its technical ongoing existence." [Dkt. 101 at 6 ¶ 2 (original emphasis).] Bill Dugdale, the former Chairman and current President of Dugdale, has given contradictory statements under oath on this issue. In support of G3's Motion for Summary Judgment, Mr. Dugdale attests that Dugdale continues to operate as a for-profit corporation and "has no plans to cease existence." [Dkt. 77-4 at 4 ¶¶ 11, 13.] In response to interrogatories propounded by Alcatel, however, Mr. Dugdale attested on behalf of his company that Alcatel "mortally wounded Dugdale" and is entitled to damages "related to the closure of Dugdale." [Dkt. 81-3 at 8; *see also* dkt. 103 at 3 (asserting on summary judgment that "[a]s a direct and proximate result [of Alcatel's actions], Dugdale suffered fatal financial losses and was forced to cease operations after twenty-three years in business").] In his deposition, Mr. Dugdale testified that Dugdale, "continu[es] on" because "it's a business function to recover the financial damages caused to Dugdale Communications by Alcatel." [Dkt. 102-12 at 7.]

### III.
### DISCUSSION

### A.  Successor Liability and *De Facto* Mergers

The parties' dispute hinges on whether or not the Transaction between Dugdale and G3 was a *de facto* merger, such that G3 assumed Dugdale's liabilities to Alcatel.

The parties agree that Indiana law applies to their dispute. Because this Court is exercising diversity jurisdiction and applies state substantive law, it must attempt to predict how the Indiana Supreme Court would decide state-law questions if it were presented with them today. *Mindgames, Inc. v. W. Publ'g Co*., 218 F.3d 652, 655-56 (7th Cir. 2000).

Under Indiana law, where a corporation purchases the assets of another, the buyer does not typically assume the liabilities of the seller. *Winkler v. G. Reed & Sons, Inc.*, 638 N.E.2d 1228 (Ind. 1994). There are four generally recognized exceptions to this rule, including (1) an implied or express agreement to assume the obligation; (2) a fraudulent sale of assets done for the purpose of escaping liability; (3) a purchase that is a *de facto* consolidation or merger; or (4) instances where the purchaser is a mere continuation of the seller. *Sorenson v. Allied Prods. Corp.*, 706 N.E.2d 1097, 1099 (Ind. Ct. App. 1999).

Alcatel argues in favor of the *de facto* merger exception. In *Cooper Industries, LLC v. City of South Bend*, the Indiana Supreme Court recognized that "[c]ourts sometimes treat asset transfers as *de facto* mergers where the economic effect of the transaction makes it a merger in all but name." 899 N.E.2d 1274, 1288 (Ind. 2009). The Indiana Supreme Court found that "some pertinent findings" in this analysis include "continuity of the predecessor corporation's business enterprise as to management, location, and business lines; prompt liquidation of the seller corporation; and assumption of the debts of the seller necessary to the ongoing operation of the business." *Id.* After analyzing the facts of the transaction at issue, the Indiana Supreme Court concluded that the facts in that case supported the trial court's decision on summary judgment that a *de facto* merger had occurred. *Id.* at 1290.

**B.  No Transfer of Stock in the Transaction**

G3 ignores *Cooper Industries* in its memorandum supporting its request for summary judgment and attempts to summarily dismiss that opinion in a footnote in its reply brief.  [Dkt. 120 at 4 n.5.]  Instead, G3 focuses its argument on its belief that because there was no transfer of stock between Dugdale and G3, a *de facto* merger could not have occurred as a matter of law.  In support of that argument, G3 cites *Travis v. Harris Corporation*, in which the Seventh Circuit Court of Appeals held that

> [w]here the assets are sold for cash, no basic, fundamental change occurs in the relationship of the stockholders to their respective corporations, and absent continuity of shareholder interest, the two corporations are strangers, both before and after the sale. . . .  Absent a transfer of stock, the nature and consequences of a transaction are not those of a merger.

565 F.2d 443, 447 (7th Cir. 1977).

The Court does not find *Travis* to be dispositive.  As noted above, when exercising diversity jurisdiction, the Court must attempt to predict how the Indiana Supreme Court would decide state-law questions if it were presented with them today.  *Mindgames, Inc.*, 218 F.3d at 655-56.  The Indiana Supreme Court's most recent pronouncement of law regarding *de facto* mergers occurred thirty-two years after *Travis*, did not cite *Travis*, and did not list the transfer of stock as one of the pertinent factors to determine if a *de facto* merger occurred.  *Cooper Indus.*, 899 N.E.2d at 1288.  Additionally, the list of factors in *Cooper Industries* is not exhaustive, and the Indiana Supreme Court considered additional factors in its analysis in that case.  *See* 899 N.E.2d at 1288 ("[s]ome pertinent factors *might* include continuity of the predecessor . . .") (emphases added); 899 N.E.2d at 1289 (also considering public proxy statement that showed predecessor corporation was listed as subsidiary of successor corporation).  Therefore, it appears that the Indiana Supreme Court now takes a factor-based approach and weighs all pertinent factors to de-

termining whether a *de facto* merger occurred instead of the rule-based approach taken in *Travis*. For these reasons, the Court finds that while the factfinder might consider the absence of a stock transfer in its analysis (or any other factor it deems pertinent), it is not dispositive on summary judgment.

## C. Applying the *Cooper Industries* Factors

The Court will address each of the three factors listed in *Cooper Industries*. While G3 largely ignores *Cooper Industries* in its briefing, its discussion of the evidence in support of its other arguments is detailed below.

### 1. Continuity

The first *Cooper Industries* factor is whether there has been continuity of the predecessor corporation's business enterprise as to management, location, and business lines. 899 N.E.2d at 1288.

G3 argues that there is insufficient continuity for its transaction with Dugdale to constitute a *de facto* merger. G3 emphasizes that there was no continuity of management because it "only" hired thirteen (46%) of Dugdale's employees and "only one, Angie Witham, acted in a management capacity at Dugdale (President and CEO) and was hired in a management capacity at G3." [Dkt. 76 at 10-11.] G3 also argues that it never occupied Dugdale's physical location, so there was no continuity of physical operation. G3 does not address the continuity of business lines factor.

The Court cannot say as a matter of law that this factor operates in G3's favor. On summary judgment, Alcatel—the non-moving party—is entitled to the benefit of inferences that can be drawn in its favor from the designated evidence. The designated evidence shows that there may be continuity of management because Ms. Witham, who was Dugdale's President and CEO,

was hired by G3 as an Executive Vice President. [Dkt. 101 at 16.] Ms. Witham represented to G3 that she had been running "all aspects" of Dugdale since 2002. [Dkt. 102-16 at 2.]

Additionally, the designated evidence also shows that continuity of location may exist because the thirteen employees G3 hired from Dugdale continued to work for G3 from Dugdale's location for sixty days. [Dkts. 102-1 at 19; 77-4 at 3 ¶ 6.] And G3 continued to use Dugdale's phone numbers, email addresses, and website after that time. [Dkts. 101 at 17; 102-1 at 19.] Given the widespread use of technology today, location is more dependent on people and less dependent on physical location.

Finally, the designated evidence shows that continuity of business lines may exist because G3 purchased, among other things, Dugdale's intellectual property, customer and prospect lists, customer contracts, assumed contracts, and work in process. [Dkt. 77-1 at 2-3 ¶ 2.1.] Moreover, the information Dugdale gave its clients explained that Dugdale and G3 were "merging," that Dugdale's "product offering will remain the same with some additions," and that "[t]his merger is fully endorsed by [the product suppliers]." [Dkt. 102-8 at 2.]

The factfinder will have to weigh this evidence, in conjunction with other pertinent factors, to determine whether G3 assumed Dugdale's liabilities related to this lawsuit in a *de facto* merger.

### 2. Prompt Liquidation

The second *Cooper Industries* factor is whether there has been a prompt liquidation of the selling corporation. 899 N.E.2d at 1288.

G3 emphasizes that Dugdale has not liquidated or declared bankruptcy. Therefore, G3 contends that "Dugdale's continued existence precludes the *de facto* merger exception." [Dkt. 76 at 9, 12.] G3 relies on Mr. Dugdale's affidavit that Dugdale has "no plans to cease exis-

tence."  [Dkt. 77-4 at 4 ¶ 13.]  G3 also cites an Indiana Court of Appeals case that held that a *de facto* merger did not occur, in part, because the selling corporation never dissolved and the "two entities remain in the marketplace."  *Sorenson*, 706 N.E.2d at 1100.

Alcatel designates evidence that Dugdale has essentially liquidated because it sold its business assets and entered into a non-compete agreement with G3 that prevents Dugdale from "conducting <u>any</u> of its primary business activities despite its technical ongoing existence."  [Dkt. 101 at 6 ¶ 2 (original emphasis).]  Alcatel also emphasizes that G3 took control of Dugdale's website, email addresses, and phone numbers, [dkts. 101 at 17; 102-1 at 19], and within six months Dugdale released its five remaining employees, [dkt. 77-4 at 4 ¶ 9].  Moreover, pursuant to the Purchase Agreement, Dugdale had a financial stake in successfully transitioning its clients to G3, and all of its 2010 proceeds came from that relationship with G3.  [Dkt. 102-12 at 7-8, 9.]

The Court cannot consider Mr. Dugdale's attestation that Dugdale has "no plans to cease existence," [dkt. 77-4 at 4 ¶ 13], without also considering his contradictory attestations on behalf of his company that Alcatel "mortally wounded Dugdale" and Dugdale is entitled to damages "related to the closure of Dugdale," [dkt. 81-3 at 8; *see also* dkt. 103 at 3 (asserting on summary judgment that "[a]s a direct and proximate result [of Alcatel's actions], Dugdale suffered fatal financial losses and was forced to cease operations after twenty-three years in business")].  These contradictory sworn statements by Dugdale's President create an issue of material fact for the factfinder regarding the status of Dugdale's operations.

Moreover, in *Cooper Industries*, the Indiana Supreme Court held that a business arrangement was a *de facto* merger despite the fact that the predecessor remained "legally and financially available to satisfy its remaining liabilities for three years."  899 N.E.2d at 1289.  The fact that Dugdale has not legally dissolved approximately two years after the Transaction does

not preclude a *de facto* merger as a matter of law. Likewise, pursuant to *Cooper Industries*, Dugdale remaining "legally and financially available" to prosecute claims against Alcatel and to satisfy liabilities that Alcatel may have against it does not preclude a *de facto* merger as a matter of law. 899 N.E.2d at 1289; [*see* dkt. 102-12 at 7 (Mr. Dugdale testifying that Dugdale "continu[es] on" to "prosecut[e] this lawsuit against Alcatel")].

To the extent G3 relies on *Sorenson* for the proposition that a *de facto* merger didn't occur because Dugdale remains "in the marketplace," 706 N.E.2d at 1100, the Court finds that inherent within that phrase is the notion that the predecessor entity is still engaged in business and commerce. *See* The American Heritage College Dictionary 831 (3rd ed. 1997) (defining "marketplace" as "[t]he world of business and commerce").

Based on Mr. Dugdale's contradictory attestations and the designated evidence detailed above, the Court cannot find as a matter of law that this factor operates in G3's favor. The factfinder will have to weigh this evidence, in conjunction with other pertinent factors, to determine whether G3 assumed Dugdale's liabilities related to this lawsuit in a *de facto* merger.

### 3. Assumption of Necessary Debts

The final factor listed in *Cooper Industries* is whether G3 assumed the debts necessary to the ongoing operation of Dugdale's business. 899 N.E.2d at 1288.

G3 does not dispute that it purchased a portion of Dugdale's liabilities related to the customer contracts and approvals it acquired from Dugdale. [Dkt. 120 at 6.] G3 argues, however, that Dugdale retained most of its liabilities and "[o]f particular importance, G3 did not assume the liability of this lawsuit." [Dkt. 76 at 12.]

Construing the designated evidence to give the benefit of reasonable inferences to the non-moving party—Alcatel—G3 may have assumed liabilities necessary to the ongoing opera-

tion of Dugdale's business. G3 assumed client contracts and corresponding liabilities, as well as COBRA obligations necessary to employ the thirteen Dugdale employees who continued to work with Dugdale's clients. [Dkt. 101 at 21.] Moreover, Jim Heckman, a G3 employee responsible for finance and accounting,[2] testified as follows:

> Q. Did G3 receive everything it needed from [Dugdale] to maintain and carry on the relationships with the clients and relationships it obtained from [Dugdale]?
>
> ***
>
> A. The answer to that is yes.
>
> Q. And G3 took on the obligations and liabilities to those clients that it obtained through the transaction?
>
> A. The liabilities related to those contracts, yes.

[Dkt. 102-5 at 16.]

Based on this evidence, the Court cannot find as a matter of law that this factor operates in G3's favor. The factfinder will have to weigh this evidence, in conjunction with other pertinent factors, to determine whether G3 assumed Dugdale's liabilities related to this lawsuit in a *de facto* merger.

In sum, the factfinder must weigh the evidence and determine whether or not the G3-Dugdale Transaction was a *de facto* merger. While the three factors listed in *Cooper Industries* are pertinent to the analysis, as noted above, that list is not exhaustive. Therefore, the factfinder might also consider other factors supported by the evidence, including that stock was not transferred between the parties and that the parties publicly described their business dealing as "the

---

[2] Alcatel cites Mr. Heckman's deposition testimony throughout its response without identifying who Mr. Heckman is. By not explaining Mr. Heckman's role, Alcatel needlessly complicated the Court's ability to discern the import of his testimony. Based on designated testimony, however, the Court was able to discern that Mr. Heckman is a management-level G3 employee who is responsible for the finance and accounting aspects of the company. [Dkt. 102-5 at 5, 6.] In the future, Counsel should identify their deponents on summary judgment.

epitome of a merger." *See Cooper Indus.*, 899 N.E.2d at 1289 (relying, in part, on proxy statement sent to shareholders listing predecessor as subsidiary of purchasing corporation to conclude *de facto* merger occurred). Because the Court cannot decide this issue as a matter of law at this time, G3 is not entitled to summary judgment.

**IV.**
**CONCLUSION**

For the foregoing reasons, the Court cannot find as a matter of law that G3 did not assume Dugdale's liabilities related to this lawsuit. Therefore, the Court **DENIES** G3's Motion for Summary Judgment. [Dkt. 75.]

04/22/2011

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

James McGinnis Boyers
WOODEN & MCLAUGHLIN LLP
jboyers@woodmclaw.com

Raegan Mackenzie Gibson
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
rgibson@beneschlaw.com

Douglas B. King
WOODEN & MCLAUGHLIN LLP
dking@woodmaclaw.com

Mark R. Waterfill
BENESCH, FRIEDLANDER, COPLAN, & ARONOFF, LLP
mwaterfill@beneschlaw.com

Scott A. Weathers
THE WEATHERS LAW OFFICE
scott@sawlaw.net

Jamie A. Young
WOODEN & MCLAUGHLIN LLP
jyoung@woodmaclaw.com